UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICHARD B. WEBER, M.D., | : | |
| | : | CIVIL ACTION NO: |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| JOHN F. MCCORMICK in his individual and | : | |
| official capacity; DONNA P. FRANK in her | : | |
| individual and official capacity; MARK | : | |
| COMERFORD in his individual and official | : | |
| capacity; PATRICIA A. WILSON-COKER in her | : | |
| individual and official capacity; JAMES WIETRAK | : | |
| in his individual and official capacity; BRIAN J. | : | |
| LESLIE in his individual and official capacity; | : | |
| JOHN L. DEMATTIA in his individual and official | : | |
| capacity; PAUL E. MURRAY in his individual and | : | |
| official capacity; NANCY E. SALERNO in her | : | |
| individual and official capacity; CHRISTOPHER L. | : | |
| MORANO in his individual and official capacity; | : | |
| CONCEZIO A. DININO in his individual and | : | |
| official capacity; KENNETH D. O'BRIEN in his | : | |
| individual and official capacity; ROBERT E. | : | |
| MAURER, JR. in his individual and official | : | |
| capacity; STEVEN OBORSKI in his individual and | : | |
| official capacity; LAWRENCE E. SKINNER in his | : | JURY TRIAL DEMANDED |
| individual and official capacity; JANICE | : | |
| MCDONNELL in her individual and official | : | |
| capacity; GAIL MIHALAKOS in her individual and | : | |
| official capacity; KATHLEEN A. WARREN in her | : | |
| individual and official capacity; THE STATE OF | : | |
| CONNECTICUT DEPARTMENT OF SOCIAL | : | |
| SERVICES; OFFICE OF THE CHIEF STATE'S | : | |
| ATTORNEY OF THE STATE OF | : | |
| CONNECTICUT'S DIVISION OF CRIMINAL | : | |
| JUSTICE; and CONNECTICUT PEER REVIEW | : | |
| ORGANIZATION, INC., d/b/a QUALIDIGM, | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT**

Plaintiff Richard B. Weber, M.D. ("Plaintiff" or "Weber"), by his attorneys, Murtha

Cullina LLP, alleges as follows:

## INTRODUCTION

1.     This action arises from the malicious and wrongful prosecution of Weber, a well-respected physician with a long-standing ophthalmology practice, for larceny in connection with allegations of Medicaid fraud.  Defendants, who are employees of agencies of the State of Connecticut, agencies of the State of Connecticut, or agents of the State of Connecticut, participated in a retaliatory conspiracy that resulted in the deprivation of Weber's constitutionally-guaranteed civil rights pursuant to 42 U.S.C. §§ 1983 and 1985. Moreover, the Defendants' conspiracy was in flagrant violation of the federal racketeering statutes, 18 U.S.C. §§ 1961 et seq.

2.     The conspiracy began in 2001, when, in response to a complaint made by Weber about the Medicaid audit practices of the State of Connecticut Department of Social Services ("DSS"), an elected State Representative contacted DSS on behalf of Weber, advised the agency of his concerns, and encouraged communication between DSS and Weber to resolve those concerns.  Shortly after DSS learned that Weber had complained to a State Representative about its Medicaid audit practices, the Defendants launched a campaign against Weber in retaliation for the exercise of his First Amendment rights.  Specifically, DSS and its employees maliciously referred Weber for criminal investigation to the Office of the Chief State's Attorney ("OCSA")/Medicaid Fraud Control Unit ("MFCU") for purportedly using a Medicaid code in an improper manner.  DSS's referral of Weber was patently retaliatory given that DSS had been on notice of Weber's use of the code for more than five (5) years prior to its decision to refer Weber for criminal investigation, and DSS had in fact advised Weber on a previous occasion to use the Medicaid code in the same manner. Furthermore, DSS was aware of its own internal difficulties with its billing system both

during and from audits of other Medicaid providers over similar issues – none of whom were referred for criminal prosecution.  In fact, DSS's rules and regulations allowing use of this code, as used by Weber, remain the same today.

3.      In furtherance of the criminal investigation of Weber, DSS and its employees repeatedly provided to OCSA/MFCU and its employees false, incomplete, fabricated, and misleading evidence in order to have Weber prosecuted.  Despite multiple warnings by Weber through counsel that Weber's conduct was consistent with other conduct allowed by DSS, OCSA/MFCU and its employees failed and refused to conduct an independent and unbiased investigation of Weber's conduct, and instead relied on the false, incomplete, fabricated, and misleading evidence provided by DSS and its employees.

4.      OCSA/MFCU also conspired with a private, non-profit health care advisory organization, Connecticut Peer Review Organization, Inc., d/b/a Qualidigm ("Qualidigm"). DSS and its employees recommended that OCSA/MFCU hire Qualidigm for the specific purpose of investigating Weber.  DSS knew, or should have known, that Qualidigm and its employees had little or no experience concerning the specific Medicaid code or billing system at issue.  Moreover, Qualidigm did not complete an independent investigation, but instead knowingly relied upon incomplete and misleading information regarding Weber's use of the Medicaid code provided by DSS, OCSA/MFCU, and their employees.

5.      As a direct consequence of DSS and its employees' deliberate and malicious withholding of evidence and information, fabrication, concealment, and destruction of evidence and information, procurement of false and misleading evidence, and the OCSA/MFCU's failure to properly, without bias, investigate the purported misuse of the Medicaid code, Weber's office and property were illegally searched and seized, he was

unlawfully arrested by the OCSA/MFCU without probable cause, and a baseless prosecution devoid of probable cause was brought against him by the OCSA/MFCU for larceny:  State of Connecticut v. Richard B. Weber, M.D., CR-02-564924 (the "Unlawful Criminal Prosecution").

6.      On December 22, 2003, after several days of testimony at a hearing to both challenge the sufficiency of the arrest and search warrants pursuant to Franks v. Delaware, 438 U.S. 154 (1978), and to dismiss the charges based on selective prosecution and in violation of Weber's First Amendment rights, the OCSA/MFCU dropped all charges against Weber for lack of probable cause to proceed against him.

7.      In April 2004, Weber initiated an administrative proceeding before the Claims Commissioner of the State of Connecticut, In re Claim of Richard Weber, M.D., File No. 20099 ("Weber Claims Proceeding").

8.      In sworn deposition testimony in the Weber Claims Proceeding, it was revealed that OCSA/MFCU lacked probable cause at the time it initiated the prosecution against Weber; that the arrest and search warrants were founded on false, incomplete, concealed, fabricated and misleading evidence; and that the OCSA/MFCU had relied unquestioningly on false, incomplete, fabricated, and misleading evidence provided by DSS and ratified by its agent, employee, and co-conspirator Qualidigm.

9.      The Weber Claims Proceeding also revealed that DSS, its employees and agents, had directly participated in the wrongful and malicious prosecution of Weber.

10.     As a direct consequence of this reckless, malicious and conspiratorial conduct by DSS, OCSA/MFCU, Qualidigm, and their agents and employees, Weber seeks compensatory and punitive damages, and equitable and declaratory relief under 42 U.S.C. §§

1983, 1985 and 1988.  Weber also seeks damages under the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., and pendent state claims as identified

herein.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331, because the action arises under Titles 18 and 42 of the United States Code,

laws of the United States, and pursuant to 28 U.S.C. § 1343, because this action seeks redress

for violations of the federal civil rights statutes.

12.     This Court has supplemental jurisdiction over the State law claims pursuant to

28 U.S.C. § 1367.

13.     Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b),

as each of the Defendants reside or has a principal place of business in the District and a

substantial part of the events and omissions giving rise to the claims occurred here.

## PARTIES

Plaintiff

14.     Weber is a resident of the State of Connecticut and is an ophthalmologist

specializing in medical and surgical disease of the retina and vitreous.  Weber's specialty

includes comprehensive treatment of diabetic retinopathy.  Weber has practiced in Stamford,

Connecticut for approximately 19 years and has an office at 1275 Summer Street, Stamford,

Connecticut.  At all times relevant to the Complaint, Weber treated, among others, Medicaid

patients.

Department of Social Services Defendants

15.     Defendant John F. McCormick ("McCormick") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by DSS as Accounting Manager of the DSS Office of Quality Assurance ("OQA").  Defendant McCormick oversees DSS audits of Medicaid providers and directly supervises DSS employees, including Defendants Donna Frank and Mark Comerford.

16.     Defendant Donna P. Frank ("Frank") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by DSS as a Supervising Accounts Manager.  Defendant Frank reviews Medicaid provider claim requests to determine whether they qualify for reimbursement under Medicaid.

17.     Defendant Mark Comerford ("Comerford") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by DSS as a Supervising Accounts Manager.  Defendant Comerford reviews Medicaid provider claim requests to determine whether they qualify for reimbursement under Medicaid.

18.     Defendant Commissioner Patricia A. Wilson-Coker ("Wilson-Coker") is a resident of the State of Connecticut and at all times relevant to this Complaint was the Commissioner of Social Services and the head of DSS ("Wilson-Coker").  Defendant Wilson-Coker creates, approves, and/or implements the policies and procedures of DSS.

19.     Defendant James Wietrak ("Wietrak") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by DSS as Director of Quality Assurance.  Defendant Wietrak supervises DSS managers and personnel, oversees the OQA, and is responsible for referring Medicaid providers to the OCSA/MFCU for criminal investigation.

20.     Defendant Department of Social Services is an executive agency existing pursuant to and under the laws of the State of Connecticut and has a principal place of business at 25 Sigourney Street, Hartford, Connecticut.  DSS has the authority to administer the federal-state Medicaid program in the State of Connecticut, audit Medicaid providers, screen Medicaid reimbursements, and refer Medicaid providers for criminal investigation. DSS is responsible for the training and supervision of its employees and for the creation of rules, regulations, policies and practices with respect to, among other things, the payment of Medicaid providers, Medicaid audits, and referrals for criminal investigation.

Office of the Chief State's Attorney/Medicaid Fraud Control Unit Defendants

21.     Defendant Nancy E. Salerno ("Salerno") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by OCSA as a prosecuting attorney and as the supervisor of the MFCU.  Defendant Salerno had oversight of the criminal investigation and prosecution of Medicaid providers referred by DSS.  Defendant Salerno, as supervisor of the MFCU, also supervised Defendant Brian Leslie.  Upon information and belief, Defendant Salerno was no longer employed by OCSA/MFCU as of December 2002.

22.     Defendant Brian J. Leslie ("Leslie") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by OCSA in the MFCU as a prosecuting attorney.  Defendant Leslie was lead prosecutor in the Unlawful Criminal Prosecution.  Defendant Leslie was responsible for overseeing the criminal investigation and prosecution of Medicaid providers referred by DSS.  Since about November 2003, Defendant Leslie is no longer employed by OCSA in the MFCU.

23.     Defendant John L. DeMattia ("DeMattia") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by OCSA as a prosecuting attorney and succeeded Defendant Salerno as supervisor of the MFCU. Defendant DeMattia had oversight of the criminal investigation and prosecution of Medicaid providers referred by DSS.  Defendant DeMattia, after succeeding Defendant Salerno as supervisor of the MFCU, also directly supervised Defendant Leslie.

24.     Defendant Paul E. Murray ("Murray") is a resident of the State of Connecticut and at all times relevant to this complaint was employed by OCSA as a prosecuting attorney. Since June 2003, Defendant Murray has been the Deputy Chief State's Attorney for the State of Connecticut.  Defendant Murray staffs and supervises prosecuting attorneys in the MFCU, including Defendants DeMattia and Leslie.

25.     Defendant Christopher L. Morano ("Morano") is a resident of the State of Connecticut and at all times relevant to this complaint was employed by OCSA as a prosecuting attorney.  From December 2002, until September 2006, Defendant Morano has been the Chief State's Attorney for the State of Connecticut.  Defendant Morano implemented OCSA policies and procedures, supervised OCSA prosecuting attorneys, and directly supervised Defendant Murray.  Prior to December 2002, Defendant Morano was the Deputy Chief State's Attorney for the State of Connecticut.  As such, Defendant Morano staffed and supervised prosecuting attorneys in the MFCU, including Defendants Salerno, DeMattia, and Leslie.  Since September 2006, Defendant Morano no longer is employed by the State of Connecticut.

26.     Defendant Concezio A. DiNino ("DiNino") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by OCSA as an

Inspector in the MFCU and successor to Defendant Steven Oborski as the MFCU Supervisory Inspector. Defendant DiNino investigates allegations of criminal conduct by Medicaid providers and staffs and supervises OCSA/MFCU Inspectors, including Defendant Kenneth D. O'Brien.

27.     Defendant Kenneth D. O'Brien ("O'Brien") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by OCSA as an Inspector in the MFCU. Defendant O'Brien investigates allegations of criminal conduct by Medicaid providers.

28.     Defendant Robert E. Maurer, Jr. ("Maurer") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by OCSA as a Forensic Fraud Examiner in the MFCU. Defendant Maurer investigates allegations of criminal conduct by Medicaid providers, and, in that capacity, works directly with MFCU Inspectors, including Defendants DiNino, O'Brien, and Steven Oborski.

29.     Defendant Steven Oborski ("Oborski") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by OCSA as Supervisory Inspector of the MFCU. Defendant Oborski investigates allegations of criminal conduct by Medicaid providers and staffs and supervises OCSA/MFCU Inspectors, including Defendants DiNino and O'Brien. Defendant Oborski was succeeded as the Supervisory Inspector of the MFCU by Defendant DiNino.

30.     Defendant Lawrence E. Skinner ("Skinner") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by OCSA as Chief Inspector. Defendant Skinner supervises OCSA Inspectors in the MFCU, ensures that the Inspectors properly conduct investigations of allegations of criminal conduct by Medicaid

providers, and ensures that the Inspectors maintain necessary levels of training and expertise to properly conduct criminal investigations.

31.     Defendant Office of the Chief State's Attorney is a branch of the State of Connecticut's Division of Criminal Justice (the "Division").  The OCSA is responsible for the overall administration of the Division and for overseeing the investigation and prosecution of all crimes committed against the State of Connecticut, including Medicaid fraud.  The OCSA has a principal place of business at 300 Corporate Place, Rocky Hill, Connecticut.

Qualidigm Defendants

32.     Defendant Connecticut Peer Review Organization, Inc., d/b/a Qualidigm is a non-profit corporation organized under the laws of the State of Connecticut, with a principal place of business at 100 Ross Common Drive, Middletown, Connecticut  06457.  At all times relevant to this Complaint, Qualidigm had a contract with the State of Connecticut and was responsible for processing and analyzing the appropriateness of Medicaid claims for reimbursement submitted to DSS by Medicaid participants.  At all times relevant to this Complaint, Qualidigm was an agent of the State of Connecticut.

33.     Defendant Janice McDonnell ("McDonnell") is a resident of the State of Connecticut and at all times relevant to this Complaint was employed by Qualidigm. Defendant McDonnell is the Hospital Payment Monitoring Project Coordinator for Qualidigm and responsible for monitoring Medicaid claims submitted by hospitals located in Connecticut and Rhode Island.

34.     Defendant Gail Mihalakos ("Mihalakos") is a resident of the State of Connecticut and at all times relevant to this Complaint was the Director of Case Management

10

of Qualidigm.  Defendant Mihalakos was responsible for supervising various coding specialists, including Defendant McDonnell.

35.     Defendant Kathleen A. Warren ("Warren") is a resident of the State of Connecticut and at all times relevant to this Complaint was the Chief Quality Officer of Qualidigm.  Pursuant to contract between Qualidigm and the State of Connecticut, and at the request of DSS and OCSA/MFCU, Defendant Warren assigns Qualidigm employees to criminal investigations conducted by the OCSA/MFCU.

Nature of the Allegations

36.     Each of the Defendants, McCormick, Frank, Comerford, Wilson-Coker, Wietrak, Leslie, DeMattia, Murray, Salerno, Morano, DiNino, O'Brien, Maurer, Oborski, Skinner, McDonnell, Mihalakos and Warren, is sued in his or her individual and/or personal capacity (as the "Individual Defendants") and, for actions taken by the Individual Defendants in their individual capacities, Weber seeks monetary relief, including compensatory and punitive damages, as well as attorneys' fees and costs for the maintenance of this lawsuit and attorneys' fees and costs associated with the Unlawful Criminal Prosecution.

37.     Each of the Individual Defendants also is sued in his or her official capacity (as the "Official Defendants"), and, for actions taken by the Official Defendants in their official capacities, and for the actions of DSS and the OCSA, Weber seeks equitable, declaratory, and other non-monetary relief, as well as attorneys' fees and costs for the maintenance of this lawsuit and attorneys' fees and costs associated with the Unlawful Criminal Prosecution.

38.     For actions taken by Qualidigm as a state actor, Weber seeks equitable, declaratory, and other non-monetary relief, as well as attorneys' fees and costs for the

11

maintenance of this lawsuit and attorneys' fees and costs associated with the Unlawful Criminal Prosecution.

39.     For actions taken by Qualidigm as a private actor, Weber seeks monetary relief, including compensatory and punitive damages, as well as attorneys' fees and costs for the maintenance of this lawsuit, and attorneys' fees and costs associated with the Unlawful Criminal Prosecution.

40.     At all times relevant to this Complaint, the Individual Defendants acted under color of state law.

41.     At all times relevant to this Complaint, Qualidigm was a state actor, in that its acts were directed, sanctioned, and authorized by the State of Connecticut, acting as agents of DSS and OCSA.

42.     At all times relevant to this Complaint, Qualidigm and its employees were the agents of DSS and OCSA.

43.     Alternatively, at all times relevant to this Complaint, Qualidigm and its employees were private actors.

## FACTS

44.     The facts alleged herein are derived and developed in significant part from sworn testimony in the Unlawful Criminal Prosecution, information made available pursuant to requests through the Connecticut Freedom of Information Act ("FOIA"), and sworn deposition testimony, documents, and other discovery conducted in the Weber Claims Proceeding.

The Medicaid Claim Reimbursement Process

45.     As alleged above, Weber was maliciously referred for criminal prosecution for his alleged illegal use of a certain Medicaid code.  The Medicaid code at issue is commonly used in connection with Medicaid reimbursement claims submitted by physicians.

46.     Physicians, such as Weber, submit claims for reimbursement to health care payors, such as Medicare, Medicaid, and private health care insurance companies using either a health insurance claim form known as "HCFA 1500" (now known as a "CMS 1500") or by electronic filing.

47.     For all times relevant to this Complaint, the HCFA 1500 and the electronic filing process are universally accepted means by which physicians submit claims for reimbursement.

48.     The manner in which a physician's claims for reimbursement are invoiced ("Coded" or "Coding"), however, depends on the specific requirements of the various health care insurance or payors.  Medicaid, for example, uses the Common Procedure Terminology ("CPT") Coding system.

49.     Claims for reimbursement submitted to Medicaid must identify each treatment performed by identifying the relevant CPT procedure code.

50.     As the state agency responsible for administrating the federal-state Medicaid program, DSS also is responsible for providing information to physicians regarding the Medicaid Coding process.

51.     DSS contracted with Electronic Data Systems ("EDS") to process and pay Medicaid claims on behalf of DSS.  Accordingly, claims for reimbursement for services rendered to Medicaid recipients by Medicaid providers are forwarded to EDS for processing.

13

52.     EDS processes these claims pursuant to specific rules and regulations established and provided to them by DSS.

53.     DSS requires each enrolled Medicaid provider to enter into a Provider Agreement with DSS (the "Provider Agreement").

54.     The Provider Agreement between DSS and each Medicaid provider specifically requires that DSS "make timely determination of the eligibility for payment hereunder of claims submitted by [a Medicaid] Provider, and prompt payment of such eligible claims for goods and services so provided at rates and/or in amounts in accordance with those established by [DSS]."


History of Reimbursements for Professional and Technical Components of Treatment

55.     Beginning in the early 1990's, Medicare and other major health care payors changed the way they paid reimbursements for many procedures and treatments provided by physicians that involved the use of specialized equipment.  Specifically, Medicare and other health care payors recognized that it was less expensive to have certain procedures or treatments performed in a physician's office rather than in a hospital.

56.     Prior to the early 1990's, a physician's reimbursement for a procedure or treatment using specialized equipment would be the same whether performed in his/her office or in a hospital.  However, if the same procedure or treatment was performed in a hospital, Medicare and other health care payors would receive both a claim by the physician for the treatment performed and an additional claim by the hospital for use of the hospital equipment and facilities.

57.     In an attempt to encourage physicians to perform certain procedures and treatments in their offices, physicians were paid a higher reimbursement for certain procedures or treatments that were performed in the physician's office rather than in a hospital.

58.     Generally, the new, higher reimbursement occurred in one of two ways:  (1) either the physician was paid an additional amount for performing the procedure or treatment in his/her office using his/her own specialized equipment, or (2) the physician was paid a lesser amount if he/she performed the procedure in a hospital using hospital-owned equipment.

59.     Under this new reimbursement policy, a physician's reimbursement fee effectively was split into two components – a "professional component" and a "technical component."  The professional component represents the skills of the physician to perform a specific procedure or treatment ("Professional Component").  The technical component, which is alternatively referred to as a "facility fee" or "site-of-service differential" ("Site-of-Service Differential"), represents the reimbursement to the physician for the use of his/her specialized equipment and disposable supplies required to perform a specific procedure or treatment, including overhead related to such equipment and supplies.

60.     This division of reimbursement fees into a Professional Component and a Site-of-Service Differential has long-since become standard practice with Medicare and other major health care payors.

Weber's Practice as an Ophthalmologist

61.    For all times relevant to this Complaint, Weber was under contract with DSS as a Medicaid provider pursuant to the terms and conditions of the Provider Agreement with DSS.

62.    In his practice as an ophthalmologist, Weber used a Coherent Laser to perform photocoagulation treatments and surgery ("Laser Treatments").

63.    Prior to 1992, Weber performed Laser Treatments using a laser facility at St. Joseph's Hospital in Stamford, Connecticut.

64.    After June 1992, Weber used a more advanced Model 920 Coherent Dye Laser purchased by Weber at a cost of approximately $53,000, and located at Weber's Stamford office.

65.    In 2001, Weber replaced the Model 920 Coherent Dye Laser with two new lasers that cost approximately $103,000 in total.

66.    Beginning in June 1992, all laser machines and facilities used by Weber to perform Laser Treatments were owned by Weber and located at Weber's Stamford office.

67.    Pursuant to Medicaid's CPT Coding system, claims for reimbursement of Laser Treatments were identified on the HCFA 1500 by CPT procedure code 67228 ("Laser Procedure Code").

68.    In 1994, Weber's office contacted the DSS Provider Relations Unit to determine how to bill for a Site-of-Service Differential for Laser Treatments performed in Weber's office.

69.    Neither DSS, nor Medicaid, had published or provided any Medicaid providers with guidelines regarding payment of Site-of-Service Differentials.

70.     In contacting DSS, Weber sought to determine if Medicaid was following the same or similar procedures as Medicare and other major health care payors regarding Site-of-Service Differentials and Professional Components, which was to pay physicians at a higher rate for Laser Treatments if the procedures were performed in the physician's office.

71.     Weber was informed that DSS policy was to allow a Site-of-Service Differential when Laser Treatments were performed in a physician's office with equipment owned by the physician, and not to reduce reimbursements for Medicaid physicians who performed Laser Treatments at a hospital.

72.     In response to Weber's query, DSS advised that if Weber submitted a claim for reimbursement for performing the Laser Treatment at his office, then he should use a specific additional code:  CPT procedure code 99070 ("99070 Code").

73.     In accordance with the advice and guidance provided by DSS, Weber submitted claims for the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code when seeking payment for Laser Treatments performed in his office.

74.     DSS also advised Weber to keep records of his use of 99070 Code with the Laser Procedure Code, which he did.

75.     On or about June 1994, DSS advised Weber's Office Manager that claims submitted pursuant to the 99070 Code could not exceed $200.00.

76.     Based upon this direction from DSS, Weber began submitting claims pursuant to 99070 Code that did not exceed $200.00, which were paid by EDS.

77.     For all times relevant to this Complaint, Weber was provided no additional guidance concerning how the 99070 Code should be used.

78.     Because the Medicaid procedure was consistent with the procedures for Site-of-Service Differentials utilized by other health care payors, including Medicare, Weber did not seek additional information regarding Medicaid's reimbursement of Site-of-Service Differentials.

79.     To this date, based upon current rules and regulations provided by DSS to EDS, EDS advises ophthalmologists performing Laser Treatments to use the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code for in-office procedures.

<u>DSS Audits of Weber's Medicaid Claims</u>

80.     As part of its responsibilities concerning the administration of the State of Connecticut's Medicaid program, DSS, through its OQA, routinely audits Medicaid providers in Connecticut.

81.     Audit candidates are selected pursuant to DSS's surveillance utilization review system ("SURS").

82.     SURS identifies as "outliers" those Medicaid providers who are submitting claims for payment that are not consistent in frequency or amount with claims submitted by other similarly situated providers.

83.     Providers identified as "outliers" may be subject to audit by DSS/OQA.

84.     Being an "outlier" does not prove the existence of any improper billing, but only that, based on all providers within a specific field, the "outlier" provider submits one billing code at a higher frequency or amount than other similarly situated providers.  Various appropriate explanations for being identified as an "outlier" include practicing a specific

specialty within a type of provider, ownership of specific equipment not typically owned by members of that provider group, or individual providers acting on specific instructions from DSS or EDS personnel.

85.     After a Medicaid provider is audited, the provider is generally removed from the pool of providers selected pursuant to SURS for a period of time, and will not be subject to audit or reviewed for audit during that time.

**1995 Audit**

86.     DSS reviewed Weber's use of the 99070 Code in conjunction with Laser Treatments and the Laser Procedure Code in 1996.

87.     DSS employee Raymond Brown ("Brown") and Defendant Comerford performed a "desk review audit" and reviewed Weber's Medicaid claims for the period of January 1, 1995, through December 31, 1995 (the "1995 Audit").

88.     During the 1995 Audit, DSS/OQA knew or should have known of Weber's use of the 99070 Code in conjunction with the Laser Procedure Code.

89.     At no time during or as a result of the 1995 Audit did DSS/OQA or its employees question to Weber his use of the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code.  Moreover, DSS/OQA never instructed Weber not to use the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code.

**1996 Audit**

90.     DSS/OQA again audited Weber concerning his use of the 99070 Code in 1996 (the "1996 Audit").

91.     During the 1996 Audit, DSS/OQA was once again made aware of Weber's use of the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code.

92.     During this audit, DSS/OQA specifically contacted Weber's Office Manager, Veronica Rivera ("Rivera").  At various times in May and June 1997, Weber, and members of Weber's staff, advised DSS/OQA that Weber used the 99070 Code each time he submitted reimbursement claims for use of the Laser Procedure Code.

93.     At no time during or as a result of the 1996 Audit did DSS/OQA question Weber's use of the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code.  Moreover, DSS/OQA never instructed Weber not to use the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code.

**1997 Audit**

94.     On September 29, 1997, DSS employee Brown sent a memorandum to Defendant Comerford again identifying Weber's use of the 99070 Code in conjunction with the Laser Procedure Code (the "1997 Audit").

95.     During the 1997 Audit, DSS/OQA was once again made aware of Weber's use of the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code.

96.     Again, at no time during or as a result of the 1997 Audit did DSS/OQA or its employees question to Weber his use of the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code.  Moreover, DSS/OQA never instructed Weber not to use the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code.

**1998 Audit**

97.     In 1998, DSS/OQA again audited Weber's Medicaid claims for the period of January 1997 through January 1998 (the "1998 Audit").

98.     During the 1998 Audit, DSS again was made aware of Weber's use of the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code, which is reflected in internal DSS/OQA memoranda generated as part of the 1998 Audit.

99.     DSS employee Brown even sent to Defendant Frank a memorandum identifying Weber's use of the 99070 Code in conjunction with the Laser Procedure Code.

100.     As a result of the 1998 Audit, DSS took no action against Weber for his use of the 99070 Code in conjunction with the Laser Procedure Code.

101.     Again, at no time during or as a result of the 1998 Audit did DSS/OQA or its employees question to Weber his use of the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code.  Moreover, DSS/OQA never instructed Weber not to use the 99070 code as a Site-of-Service Differential in conjunction with Laser Procedure Code.

102.     The 1998 Audit was closed by Defendant Frank on or about July 15, 1998.

**2000 Audit**

103.    In 2000, DSS/OQA audited Weber's Medicaid claims for the period of April 1, 1998, through March 31, 2000, through a "provider audit" ("2000 Audit"), which involved direct interaction with Weber and his staff.

104.    During the 2000 Audit, Weber repeatedly requested that DSS provide him with procedures or guidelines concerning the audit process.

105.    DSS/OQA never provided Weber with any procedures or guidelines concerning the audit process.

106.    DSS employee Defendant McCormick specifically advised Weber that no such procedures or guidelines existed.

107.    During the 2000 Audit, DSS/OQA, and, in particular its employees, Defendants McCormick and Frank again were repeatedly made aware of Weber's use of the 99070 Code in conjunction with the Laser Procedure Code.

108.    At the 2000 Audit exit conference, Weber again advised DSS/OQA and Defendants McCormick and Frank that Weber was using the 99070 Code as a Site-of-Service Differential in conjunction with use of the Laser Procedure Code.

109.    In fact, the DSS/OQA minutes from the exit conference evidence a general understanding by DSS of Weber's use of the 99070 Code, Professional Components, and Site-of-Service Differentials.

**The Final Audit Report for the 2000 Audit**

110.    On January 3, 2001, DSS/OQA issued its final Audit Report for the 2000 Audit (the "Final Audit Report").

111.    The Final Audit Report indicated that DSS intended to recoup Medicaid payments made to Weber pursuant to his use of 99070 Code in conjunction with the Laser Procedure Code.

112.    The total recoupment was for $8,088.05.

113.    DSS concluded the recoupment was proper because "[t]he copies of the medical records sent to [DSS] for review provided insufficient information to support the billing of [the 99070 Code] − Supplies and materials (except spectacles), provided by [Weber] over and above those usually included with the office visit or other services rendered (list drugs, supplies, or materials). . . ."

114.    Pursuant to the terms of Weber's Provider Agreement with DSS and consistent with DSS audits of providers similar to Weber and their use of the 99070 Code, Weber was entitled to keep this money as reimbursement for services provided to Medicaid recipients.

115.    Again, at no time either during the 2000 Audit process, the exit conference, or in the Final Audit Report did DSS/OQA indicate that Weber's use of the 99070 Code was fraudulent, criminal, or otherwise improper.

116.    In fact, sworn testimony by EDS and DSS personnel during the Weber Claims Proceeding indicates that the 99070 Code can be used in conjunction with any Medicaid reimbursement code.  DSS has placed no restrictions on EDS to reimburse a Medicaid provider for such use.

117.    Moreover, the Final Audit Report, which is required to accurately reflect the findings of DSS/OQA, is devoid of any factual conclusions that would support allegations of fraud.

118.    Indeed, because Weber had been proactive and helpful during the 2000 Audit, DSS employee and Defendant McCormick thanked Weber in writing for "the courtesy and cooperation extended to [the DSS/OQA] representative during the course of this audit."

119.    Moreover, in a separate cover letter to Weber, Defendants McCormick and Frank informed Weber that "[DSS] recognizes your commitment to providing ophthalmology services to our clients and hopefully this process will not deter you from continuing to provide the service in Connecticut."

**Weber's Exercise of his First Amendment Rights**

120.    After the conclusion of the 2000 Audit and receipt of the Final Audit Report, Weber was disturbed by the conduct, findings, and behavior of DSS/OQA and its employees.

121.    Weber contacted his State Representative, Christel H. Truglia, of the 145th District ("Truglia"), and reviewed his complaints of DSS/OQA, its employees, and the 2000 Audit with her.

122.    Truglia recommended that Weber forward to her a letter setting forth his concerns, which she would forward to Defendant Wilson-Coker, DSS Commissioner.

123.    In a letter dated January 17, 2001, Weber informed Truglia of his complaints regarding DSS, Defendant McCormick, the DSS/OQA audit process, DSS's failure to have defined procedures for the audit of Medicaid providers, and DSS's systemic problems with acknowledging and reimbursing Medicaid providers for Site-of-Service Differentials (the "Weber Letter").

124.    In the Weber Letter, Weber also advised Truglia as to his use of the 99070 Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code.

Specifically, Weber told Truglia that, "[he] had been advised by Medicaid as to the use of this code in a series of phone conversations in 1992 along with the proper fee to use in billing for the use of [his] laser."

125.    Along with a cover letter dated January 29, 2001, Truglia forwarded the Weber Letter to Defendant Wilson-Coker, advising her of Weber's concerns and problems regarding the audit process, DSS, the manner in which the State of Connecticut's Medicaid program was operating, and his justification for the use of the 99070 Code (the "Truglia Letter").  In the Truglia Letter, Truglia requested that Defendant Wilson-Coker review Weber's concerns.

126.    In February 2001, Defendant Wilson-Coker and DSS Deputy Commissioner Michael Starkowski provided the Truglia and Weber Letters to DSS employee Defendant Wietrak, who was directed to draft a response to the Truglia Letter on behalf of Defendant Wilson-Coker.

127.    Defendants McCormick and Wietrak drafted a letter for Defendant Wilson-Coker's signature responding to the Truglia Letter (the "Wilson-Coker Response").

128.    On February 21, 2001, Defendant Wilson-Coker signed and sent the Wilson-Coker Response to Truglia.

129.    The Wilson-Coker Response contained numerous material omissions and false statements, misleadingly and incorrectly described the DSS/OQA Medicaid provider audit process, and was patently self-serving to those DSS employees, including Defendant McCormick, who participated in or had oversight of the 2000 Audit.

Specifically:

(a)    The Wilson-Coker Response stated on numerous occasions that Weber was uncooperative during the DSS/OQA audit process, including "it was [Weber's] refusal to cooperate with [DSS] auditors that made [Weber's] experience with the auditors so difficult," and "[w]e try the best we can to work with the providers during the process so as not to disrupt their operations and make the audit process as painless as possible. But, as I have previously said, to do this we need the cooperation of the providers. In the case of [Weber], this did not happen." These statements in the Wilson-Coker Response are false and directly contradict Defendant McCormick's prior statements to Weber thanking him for "the courtesy and cooperation extended to [the OQA] representative during the course of this audit."

(b)    The Wilson-Coker Response stated that Weber refused to provide DSS billing records and "clarifying documentation" concerning his Medicaid claims audited as part of the 1997 Audit. During the 1997 Audit, Weber provided to DSS all requested patient records, which included information outlining Weber's use of the 99070 Code as a Site-of-Service Differential.

(c)    The Wilson-Coker Response stated that "[c]oncerning the issue of [the 99070 Code] our audit found that [Weber] was billing [DSS] an additional $200 in conjunction with the performance of the laser photocoagulation procedure. [Weber] inappropriately used [the 99070 Code] to do this. There were no records in [Weber's] files to justify this additional charge and later explanations received by the doctor to justify the charges were inconsistent with [DSS] regulations. [Weber's] explanation that he received authorization from [DSS] to bill this charge could not be substantiated by [Weber] and is

26

highly unlikely since billing in this manner is <u>very</u> inappropriate" (emphasis in original).  This statement in the Wilson-Coker Response is also false.

In fact, as early as 1994, Weber received instructions from DSS Provider Relations Unit to use the 99070 Code in this manner.  Indeed, DSS was aware Weber was using 99070 Code in this manner since 1995, yet took no action to advise Weber that his conduct was in any way improper.  Moreover, EDS, the entity responsible for paying Medicaid claims on behalf of DSS, <u>continues to advise</u> Medicaid providers to use the 99070 Code in this manner in conjunction with the Laser Procedure Code and that the 99070 Code can be used with <u>any</u> other Medicaid CPT procedure code.  Finally, Defendant McCormick and other DSS employees have testified that the medical records from the 1996 Audit providing DSS/OQA with clear knowledge of Weber's use of the 99070 Code were in the possession of DSS since 1997.

**Criminal Referral "Procedures" Within DSS**

130.    DSS is responsible for referring Medicaid providers to the MFCU branch of OCSA for criminal investigation when an audit reveals that the Medicaid provider has engaged in Medicaid fraud.

131.    Upon information and belief, DSS has never referred a Medicaid physician to OCSA/MFCU for criminal investigation that was later prosecuted.

132.    During all periods of time relevant to this Complaint, DSS referred Medicaid participants (medical providers, pharmacists, transportation providers, durable medical equipment providers, laboratories) to the OCSA/MFCU for criminal investigation based on a four-step process.

133.    First, a DSS Supervising Accounts Manager makes an initial recommendation for a fraud referral and forwards that recommendation with the Medicaid participant's file to Defendant Comerford, who was designated as the DSS fraud expert by Defendants McCormick and Frank, and by himself.

134.    Second, Defendant Comerford reviews the recommendation and file as provided by the DSS Supervising Accounts Manager to determine whether fraud has occurred.  Then, Defendant Comerford is supposed to make an independent recommendation as to whether a referral for criminal investigation should be made and forwards his recommendation and the Medicaid participant's file to Defendant McCormick.

135.    Third, Defendant McCormick is supposed to review the file and make an independent determination as to whether the Medicaid participant should be subject to criminal investigation by the OCSA/MFCU.  Defendant McCormick is not bound by either of the previous two recommendations for referral and can make his own, independent determination of whether a referral to the OCSA/MFCU should be made.

136.    Thereafter, Defendant McCormick forwards his recommendation and the Medicaid participant's file to Defendant Wietrak.

137.    Fourth, Defendant Wietrak is responsible for making the final determination of whether a Medicaid participant should be referred to the OCSA/MFCU for criminal investigation.

138.    When a referral for criminal prosecution is approved by Defendant Wietrak, the Medicaid participant's file and the criminal recommendation are forwarded to the Supervisory State's Attorney of the OCSA/MFCU.

**DSS Refers Weber for Criminal Investigation**

139.    Since at least the 1997 Audit, DSS, and in particular DSS employees

Defendants Frank and McCormick, had specific knowledge of Weber's use of the 99070

Code as a Site-of-Service Differential in conjunction with the Laser Procedure Code.

Moreover, prior to the Truglia Letter, DSS had never indicated that the use of the 99070 Code

was at all improper.

140.    No prior DSS/OQA audits involving the use of Site-of-Service Differentials

ever resulted in DSS making a referral to OCSA/MFCU for criminal investigation of a

Medicaid provider, even though total reimbursements were, in some instances, more than

fourteen times the amount of money involved in Weber's 2000 Audit.

141.    DSS's drastic change in position regarding Weber's use of the 99070 Code and

decision to refer Weber for criminal prosecution for such use occurred underlined immediately after DSS

was provided the Truglia and Weber Letters, in which Weber challenged the DSS audit

process and proceedings, as well as the findings, actions, and conduct of certain DSS

personnel.

142.    Thus, as a direct result of Weber's complaints in the Weber Letter, Defendant

McCormick and other DSS employees began a targeted retaliatory campaign against Weber.

Specifically, Defendant McCormick directed and instructed Defendant Frank to begin the

four-step process to refer Weber for criminal investigation by the OCSA/MFCU.

143.    Despite the fact that DSS has never referred a physician for criminal

investigation that was prosecuted, on the very same day that Defendant Wilson-Coker sent the

Wilson-Coker Response to Truglia (February 21, 2001), Defendant McCormick coordinated

with Defendant Frank to send to Defendant Comerford a memorandum recommending that
Weber be referred to the OCSA/MFCU for criminal investigation concerning his use of the
99070 Code in conjunction with the Laser Procedure Code.

144.    In its rush to retaliate against Weber, DSS failed to follow its four-step review
process.

145.    Defendant Frank, who had express knowledge of Weber's use of the 99070
Code in conjunction with the Laser Procedure Code, previously neither took nor
recommended taking action against him for such use prior to the Wilson-Coker Response to
the Truglia and Weber Letters.

146.    In her then-24 years of employment with DSS, Defendant Frank never had
referred a physician to the OCSA/MFCU for criminal investigation that had been prosecuted.
Nonetheless, Defendant Frank initiated action against Weber after she was directed to do so
by her supervisor, Defendant McCormick.

147.    Defendant Frank asked Defendant Comerford to help her draft and prepare a
memorandum to him (Comerford) referring Weber for prosecution (the "Weber Referral
Memorandum"), which then compromised Defendant Comerford's ability to independently
determine whether any fraud had occurred.  Moreover, in assisting Defendant Frank,
Defendant Comerford did not even review Weber's file and acted without having any
knowledge of the facts.

148.    On February 21, 2001, the same day the Wilson-Coker Response was sent to
Truglia, Defendant Frank sent the Weber Referral Memorandum to Defendant Comerford.

149.    The Weber Referral Memorandum described Weber's use of 99070 Code for
the period subject to the 2000 Audit.  Notably, the description of Weber's use of 99070 Code,

as set forth in the Weber Referral Memorandum, was identical to Weber's use of the 99070 Code in prior years from which DSS had specific knowledge as a result of the 1995, 1996, 1997 and 1998 Audits.

150.    Along with the Weber Referral Memorandum, Defendant Frank sent to Defendant Comerford an incomplete set of the records that Weber provided to DSS during the 1997 Audit and intentionally excluded the records Weber produced describing his use of the 99070 Code with the Laser Procedure Code.

151.    Although DSS had, through the 1995, 1996, 1997, 1998, and 2000 Audits, voluminous information concerning Weber's use of the 99070 Code, DSS employees Defendants McCormick and Frank intentionally failed to provide Defendant Comerford with complete information.

152.    On March 19, 2001, without complete information Defendant Comerford recklessly sent a memorandum to Defendant McCormick recommending that Weber be referred to the OCSA/MFCU for criminal investigation concerning his use of the 99070 Code. Specifically, this memorandum stated "[a]ttached is [Defendant Frank's] Memo to me recommending the referral of [Weber] to the MFCU.  After reviewing the file I concur that this provider should be referred for investigation of possible fraud against the Medical Assistance Programs."

153.    In testimony in the Weber Claims Proceeding, Defendant Comerford testified that if Defendants McCormick and Frank had provided him with Weber's DSS complete file, including the evidence that was in the possession of DSS/OQA explaining Weber's use of the 99070 Code, he would not have recommended that Weber be referred to the OCSA/MFCU for criminal investigation.

154.    As such, DSS intentionally and maliciously failed to follow its criminal investigation referral process.

155.    Moreover, DSS violated Weber's rights by intentionally and maliciously tampering with, destroying, and concealing evidence and not providing Defendant Comerford, the DSS designated fraud expert, Weber's entire DSS file before recommending the commencement of a criminal investigation for fraud.

156.    Immediately, upon receipt of Defendant Comerford's letter referring Weber to the OCSA/MFCU, Defendant McCormick forwarded his recommendation that Weber be referred for criminal investigation to Defendant Wietrak for final approval.

157.    On March 28, 2001, the same day Defendant McCormick's request for criminal investigation was received, Defendant Wietrak approved the request that Weber be referred to the OCSA/MFCU.

158.    The DSS referral process was tainted throughout and orchestrated by Defendant McCormick in such a manner as to insure a referral from DSS to the OCSA/MFCU for the criminal investigation of Weber, which was premised upon baseless recommendations and made contrary to DSS's own established policies and procedures.

**OCSA/MFCU Criminal Investigation**

159.    On or about March 28, 2001, approximately eight weeks after the Truglia Letter, Defendant McCormick contacted Defendant Salerno, supervising State's Attorney of the OCSA/MFCU, by letter requesting the OCSA/MFCU initiate a criminal investigation of Weber for his use of the 99070 Code in conjunction with use of the Laser Procedure Code.

160.   The documents attached to Defendant McCormick's letter to Defendant Salerno included:

(a)   The March 19, 2001, memorandum from Defendant Comerford to Defendant McCormick;

(b)   A copy of the 2000 Audit, Final Audit Report;

(c)   A copy of Weber's Medicaid provider agreement; and

(d)   A listing of Weber's IRS Form 1099 earnings from 1997 through 2000.

161.   In Defendant McCormick's effort to conspire against Weber, certain documents were not included with Defendant McCormick's letter to Defendant Salerno and the OCSA/MFCU, which had been in the possession, control, and custody of DSS since 1997, and which evidenced Weber's reasons and justification for using the 99070 Code.

162.   Moreover, Defendant McCormick failed to provide OCSA/MFCU with, and OCSA/MFCU failed to request, DSS's own rules and regulations concerning Medicaid CPT procedure codes, which specifically allow the use of the 99070 Code with any other code for reimbursement.

163.   Defendants McCormick, Frank, and Comerford advised OCSA/MFCU that Weber's use of the 99070 Code was fraudulent, even though DSS recouped funds from Weber because it claimed that he had not adequately justified his use of the 99070 Code, and not because DSS had determined the use of the 99070 Code was fraudulent.

164.   Defendant Salerno, who was at the time responsible for supervising the OCSA/MFCU, assigned the case to Defendant Oborski as Supervisory Inspector, Defendant DiNino as Inspector, Defendant Maurer as Forensic Fraud Examiner, and Defendant Leslie as prosecutor.

33

165.    Defendants Oborski, DiNino, Maurer, and Leslie had no training or knowledge concerning the method by which Medicaid providers submit claims to DSS, the use of the 99070 Code, the concept and accepted industry standard of reimbursement for Site-of-Service Differentials, or the systemic difficulties with the DSS reimbursement to Medicaid providers for the use of Site-of-Service Differentials.

166.    Defendant Salerno, as supervisor and director of the MFCU, knew or should have known that Defendants Oborski, DiNino, Maurer and Leslie lacked the requisite skill, knowledge, training, or education to investigate and prosecute Medicaid fraud with respect to the use of Coding by Medicaid, the 99070 Code specifically, and Site-of-Service Differentials generally.

167.    OCSA/MFCU has no program or policy to ensure that its prosecuting attorneys and inspectors are educated and trained with respect to Medicaid Coding.

**The Search Warrant**

168.    After an incomplete investigation by OCSA/MFCU that failed to reconcile repeated instances of conflicting statements from DSS and its employees regarding Weber's use of both the 99070 Code and Site-of-Service Differentials, in addition to a failure of OCSA/MFCU employees to attempt to understand CPT Coding or the DSS reimbursement policies and their difficulties, OCSA/MFCU decided to review Weber's files.

169.    Instead of requesting the records from Weber – which OCSA/MFCU could have done pursuant to the express, written terms of Weber's Medicaid Provider Agreement ─ OCSA/MFCU choose to obtain a search warrant and execute a search of Weber's Stamford office ("Search Warrant").

34

170.    Defendant DiNino drafted the Search Warrant and an affidavit in support of the Search Warrant, which both Defendants DiNino and O'Brien executed ("DiNino-O'Brien Affidavit").

171.    The DiNino-O'Brien Affidavit in support of the Search Warrant was based solely on unverified, baseless, malicious, reckless, incorrect, and incomplete representations made to Defendant DiNino by DSS and DSS employees, including Defendants McCormick and Frank.

172.    Specifically, Defendant DiNino, in swearing out the DiNino-O'Brien Affidavit, relied on the DSS's unsupported and retaliatory determination that Weber's use of the 99070 Code was fraudulent.

173.    Defendant McCormick later testified during the Weber Claims Proceeding that statements attributed to him in the DiNino-O'Brien Affidavit, on which Defendants DiNino and O'Brien specifically relied, had never been made by Defendant McCormick.

174.    One such false statement contained in the DiNino-O'Brien Affidavit as testified to by Defendant McCormick addressed the "knowingly" requirement of fraud. Specifically, contrary to statements sworn to in the DiNino-O'Brien Affidavit, Defendant McCormick testified in the Weber Claims Proceeding that Weber did not knowingly act in a manner that was fraudulent.

175.    Another false statement in the DiNino-O'Brien Affidavit involved the statement that Qualidigm reviewed copies of Weber's patient files and determined that his use of the 99070 Code was not justified.  In fact, Qualidigm never reviewed any of Weber's patient files before execution of the Search Warrant.

176.     Moreover, Defendant O'Brien testified that he swore to the accuracy of the DiNino-O'Brien Affidavit after, as testified to by Defendant O'Brien, spending "two hours, spread over a couple days or a week that [Defendant DiNino] was preparing it, and then I reviewed it and I finally signed it for [Defendant DiNino]."

177.     Moreover, Defendants DiNino and O'Brien knowingly and recklessly failed to include exculpatory evidence in the search warrant application or the DiNino-O'Brien Affidavit.

178.     Defendant Maurer further reviewed the Search Warrant and intentionally, with reckless disregard for the truth or its accuracy, alleged the existence of fraud.

179.     Defendants Salerno and Oborski recklessly approved the Search Warrant and the substance of the underlying DiNino-O'Brien Affidavit without further review or investigation.

180.     Because of their knowing and reckless conduct to deprive Weber of his constitutionally protected rights, Defendants DiNino, O'Brien, Maurer, Salerno, and Oborski alleged the existence of probable cause for the Search Warrant based on false, fabricated, misleading, and baseless allegations and their reckless disregard for the truth and concomitant probable cause.

**OCSA/MFCU Executed the Search Warrant Without Probable Cause**

181.     On or about April 17, 2002, OCSA/MFCU, including Defendants DiNino, O'Brien, Maurer, and Oborski, and the Stamford police, illegally and without probable cause executed the Search Warrant at Weber's Stamford office.

182.    The Search Warrant was executed during business hours by armed, uniformed, and plainclothes law enforcement officers in the presence of Weber, his patients and staff.

183.    In addition to the armed and uniformed Stamford police officers, the search involved an additional five members of OCSA/MFCU, with three inspectors also displaying firearms in the presence of Weber's staff and patients.

184.    The conduct of the officers and OCSA/MFCU investigators executing the Search Warrant was outrageous, overbearing, unnecessarily intrusive, and frightening for all witnesses at the search scene.

185.    Seized at the time of the search were the original files of 29 of Weber's Medicaid patients along with a complete backup tape of Weber's retinal practice.

186.    DSS already had copies of some of the files and materials seized as a result of the DSS/OQA audits of Weber's claims for reimbursement.

187.    These seizures resulted in the OCSA/MFCU obtaining access to confidential medical and personal information of over 10,000 patients, most of whom were not Medicaid recipients, in addition to confidential information pertaining to non-Medicaid related treatment of Weber's Medicaid patients.

188.    Weber, through counsel, at the specific request of Defendant DiNino, produced additional billing records on Medicaid patients delivered to Defendant DiNino shortly after the Search Warrant was executed.  These specific records included Weber's description as to use of the 99070 Code, which were created contemporaneously with Weber's billing of the Laser Procedure Code for each patient in question.

**OCSA/MFCU Hires Qualidigm Based on DSS's Recommendation**

189.    Following execution of the Search Warrant and seizure of Weber's files, DSS directed OCSA/MFCU to hire Qualidigm to investigate Weber's use of the 99070 Code.

190.    Defendant McCormick knew or should have known that Qualidigm had no experience, knowledge, or expertise concerning the analysis of Medicaid physician reimbursement claims or the DSS physician reimbursement rules and regulations, including systemic difficulties with the reimbursement for Site-of-Service Differentials.

191.    Nevertheless, Defendant McCormick specifically directed that Qualidigm be hired to review Weber's files.

192.    DSS, OCSA, Qualidigm and their employees, conspired among each other to deprive Weber of his rights as protected by the federal and state constitutions.

193.    Indeed, upon information and belief, the OCSA/MFCU had never used Qualidigm in connection with any prior investigation.

194.    In retaining Qualidigm, neither Defendants DiNino, Maurer, Salerno nor any other OCSA/MFCU employee, ever made any inquiry regarding Qualidigm's experience or qualifications to conduct or assist in a Medicaid fraud investigation.

195.    In fact, Qualidigm had never conducted a criminal investigation of a physician prior to DSS's direction that it do so against Weber.

196.    Defendant McDonnell, a Qualidigm employee, was assigned by Qualidigm to investigate Weber's use of the 99070 Code.  Defendant McDonnell had no knowledge of, or any training in, the use or payment of Site-of-Service Differentials or Professional Components, including DSS systemic difficulties with the reimbursement of Site-of-Service Differentials, the physician Medicaid Coding system, or the 99070 Code.

197.    Defendant McDonnell did not request, and was not provided, any information, education, or training regarding Site-of-Service Differentials or Professional Components, the physician Medicaid Coding system, or the 99070 Code.

198.    In addition, Defendant McDonnell never sought nor received any EDS or DSS billing guidelines, rules, or regulations pertaining to the use of the 99070 Code.

199.    Although Qualidigm and Defendant Warren, the Chief Quality Officer of Qualidigm, and Defendant Mihalakos, Defendant McDonnell's supervisor, knew or should have known that Defendant McDonnell had no knowledge of, education or training in the use or payment of Site-of-Service Differentials or Professional Components, the physician Medicaid Coding system, or the 99070 Code, they nonetheless assigned Defendant McDonnell to investigate Weber.

200.    OCSA/MFCU, including Defendants DiNino, Salerno, DeMattia, and Oborski knew, or should have known, that neither Defendant McDonnell nor Qualidigm were qualified or trained regarding the use of Site-of-Service Differentials or Professional Components, the physician Medicaid Coding system, or the 99070 Code.

201.    Defendants DiNino, O'Brien, and Oborski failed and refused to investigate Weber's use of the 99070 Code or to seek independent verification of DSS's unsupported and retaliatory determination that Weber's use of the code was fraudulent to be able to provide this information to Qualidigm.

202.    Defendants DiNino, O'Brien, and Oborski failed to contact either EDS provider relations or DSS provider relations or their billing experts and failed to review the DSS guidelines for use of the 99070 Codes, which specifically allow use of 99070 with any other CPT code, to be able to provide this information to Qualidigm.

203.     Defendants DiNino, O'Brien, and Oborski allowed Qualidigm and Defendant McDonnell to make determinations as to Weber's use of the 99070 Code based entirely on the Medicare, and not Medicaid, regulations for use of the 99070 Code.  Indeed, Medicare does not use the 99070 Code as a part of its Coding system and, therefore, Qualidigm and Defendant McDonnell had no basis to draw any conclusions from Medicare's use of the 99070 Code.

204.     However, Qualidigm and Defendant McDonnell opined – using Medicare guidelines and the incomplete information provided by DSS and OCSA/MFCU ─ that Weber's use of the 99070 Code as a Site-of-Service Differential was not justified.

205.     Qualidigm and Defendant McDonnell were well aware of the seriousness and consequences of their final report.

206.     Before issuing their report, Qualidigm and Defendant McDonnell never asked for any additional information.

207.     In fact, the Individual Defendants used the DSS/OCSA/Qualidigm relationship as an enterprise through which to make, and justify, baseless conclusions as to the culpability of Weber concerning his use of the 99070 Code.

208.     The DSS/OCSA/Qualidigm relationship involved numerous transmittals among the Entity Defendants, Qualidigm, the Individual Defendants, and Weber (by wire and through the mails) in support of the baseless, false, fabricated, and misleading conclusions used as part of an elaborate scheme to improperly recoup funds from Weber for his use of the 99070 Code.

**Arrest Warrant**

209.    Without probable cause, on or about October 1, 2002, the OCSA/MFCU, sought and secured an arrest warrant against Weber alleging one count of larceny in the first degree ("Arrest Warrant").

210.    The Arrest Warrant was based on an underlying affidavit sworn to by Defendant DiNino that contained verbatim statements from the Search Warrant, which were based upon false, baseless, malicious, reckless, incorrect, fabricated, and incomplete representations and statements by DSS and DSS employees all made with reckless disregard for the truth.

211.    In fact, Defendant McCormick testified in the Weber Claims Proceeding that statements attributed to him in both the Search and Arrest Warrants were either false or not made by him.

212.    Additionally, the Arrest Warrant contained conclusions from Qualidigm and its employees that were unfounded and based on the analysis of incomplete records.

213.    Defendant DiNino knowingly and recklessly failed to independently verify the statements in the Arrest Warrant upon which he relied and swore to the accuracy thereof, and failed to include exculpatory evidence in the Arrest Warrant application and underlying affidavit.

214.    Defendant Oborski reviewed and approved the Arrest Warrant without taking any steps to confirm the accuracy and completeness of the statements contained therein.

215.    Defendant Leslie, without questioning or independently verifying Defendant DiNino's underlying affidavit and without education of, or training in the Medicaid billing

issues involved, authorized the OCSA/MFCU to make application for the Arrest Warrant for the arrest of Weber.

216.    On October 2, 2002, Weber was illegally and unlawfully arrested and taken into custody against his will by Defendant DiNino pursuant to the Arrest Warrant dated October 1, 2002.

**Prosecution of Weber**

217.    On October 1, 2002, the State of Connecticut filed a Criminal Information against Weber for one count of larceny in the first degree by defrauding a public community, which began the Unlawful Criminal Prosecution of Weber.

218.    Lead prosecutor for the OCSA/MFCU was Defendant Leslie, who at this time was supervised by Defendant Salerno.

219.    Defendant DeMattia succeeded Defendant Salerno as supervisor of the MFCU on or about March, 2003.

220.    On December 6, 2002, Weber, through counsel, provided to Defendant Leslie a detailed submission of exculpatory evidence available at that time and Weber's justification for using the 99070 Code in conjunction with the Laser Procedure Code – all of which was in the possession and custody of DSS.

221.    Defendant Leslie then sent a memorandum to Defendant Comerford recognizing the lack of basis to continue the Unlawful Criminal Prosecution against Weber.

222.    Weber's counsel subsequently met with Defendant Leslie to discuss the information contained in the December 6, 2002 submission.

223.    After these discussions, Defendant Leslie offered to reduce the charges against Weber and to allow Weber to accept a term of accelerated rehabilitation as a plea.

224.    Nevertheless, Defendant Leslie continued to maintain the Unlawful Criminal Prosecution.

225.    On or about April 24, 2003, Weber, through counsel, filed an additional submission with Defendant Leslie that provided further exculpatory evidence concerning the charges that had been made available pursuant to various FOIA requests since the December 6, 2002 submission.

226.    Defendant Leslie knowingly and recklessly failed to either confirm or refute any of Weber's claims in the December 2002, and April 2003, submissions.

227.    Moreover, Defendant Leslie knowingly and recklessly failed to confront the DSS and OCSA/MFCU Defendants involved with the investigation and prosecution of Weber and who had conducted all of Defendant Leslie's research thus far with this information provided by Weber.

**Knowledge of the Similarly Situated Provider**

228.    In January 2003, DSS became specifically aware that another ophthalmologist was, and had been, submitting reimbursement claims to Medicaid for the 99070 Code in conjunction with the Laser Procedure Code and that such reimbursement claims were for almost twice the total amount as submitted by Weber (the "Similarly Situated Provider").

229.    DSS knowingly took no action to advise Weber of the existence of the Similarly Situated Provider.

230.    To date, DSS has taken no adverse action against the Similarly Situated Provider, including referral to the OCSA/MFCU for criminal investigation.  In fact, DSS has allowed the Similarly Situated Provider to keep the reimbursements for use of the 99070 Code through 2004.

231.    Claims for reimbursements to Medicaid by the Similarly Situated Provider were based on instruction by EDS and made in the same manner as Weber.

232.    Upon information and belief, OCSA/MFCU independently reviewed the Similarly Situated Provider's use of the 99070 Code in conjunction with the Laser Procedure Code and determined that there was no probable cause for arrest.

233.    In May 2003, Defendant Leslie became more actively involved in the development of evidence in the Unlawful Criminal Prosecution by initiating his own investigation into the claims against Weber.

234.    By May 2003, Defendant Leslie was aware of the Similarly Situated Provider, that he was using the 99070 Code as a Site-of-Service Differential in the same manner as Weber, and that DSS had not made a criminal referral of this provider for fraud concerning his use of the 99070 Code with the Laser Procedure Code.

235.    Defendant Leslie, in violation of Weber's rights and the rules of professional conduct, knowingly failed to provide this exculpatory evidence to the Court or to Weber, but instead, continued prosecuting Weber.

236.    Moreover, Defendant Leslie, subsequent to learning of the Similarly Situated Provider, continued his independent investigation of Weber in an attempt to add more counts to the already existing charges.

237.    To date, EDS continues to instruct Medicaid providers to use the 99070 Code as a Site-of-Service Differential in conjunction with use of the Laser Procedure Code.

**Weber's Motions to Suppress and Dismiss**

238.    On or about May 2, 2003, Weber, through counsel, filed a Motion to Dismiss the criminal charges against him in violation of the state and federal Constitutions due to the foundation for the charges being based upon Weber exercising his First Amendment rights (the "Motion to Dismiss").

239.    Weber's Motion to Dismiss primarily was based upon an argument of selective prosecution and that Weber was being treated differently than other, similarly situated Medicaid providers.

240.    On or about May 2, 2003, Weber also filed a Motion to Suppress each of the Search and Arrest Warrants based upon the underlying affidavit of both containing knowingly or intentionally false statements, or statements made with reckless disregard for the truth (the "Motions to Suppress").

241.    By each of the two Motions to Suppress, Weber requested and was granted a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), challenging the validity of the Search and Arrest Warrants and the underlying affidavits.

242.    The OCSA/MFCU, through Defendant Leslie, waived the initial requirement for a <u>Franks</u> hearing, which required Weber to make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."  438 U.S. at 155-56.

45

243.   A <u>Franks</u> hearing and a hearing on Weber's Motion to Dismiss were scheduled by the Court (Keller, J.) to begin on or about October 8, 2003.

244.   At various times before and during the <u>Franks</u> hearing, counsel for Weber proclaimed Weber's innocence to OCSA/MFCU and repeatedly offered proof that the Search and Arrest Warrants were unlawfully and illegally obtained based upon reckless, malicious, incorrect, and incomplete information in the underlying affidavits in violation of Weber's Constitutional rights.

245.   On or about May 29, 2003, Defendant Leslie, working in conjunction with his supervisor, Defendant DeMattia, filed a response to Weber's Motion to Dismiss, which further failed to disclose OCSA/MFCU's knowledge of the Similarly Situated Provider (the "Leslie-DeMattia Memorandum").

246.   Instead, in an effort to maintain the prosecution, Defendants Leslie and DeMattia made misrepresentations to the Court (Keller, J.), which included referring to five previous OCSA/MFCU criminal prosecutions as providing a basis for continuing the prosecution of Weber.  Upon review, it was discovered that these prosecutions neither involved Medicaid providers similar to Weber (<u>e.g.</u>, physicians), nor were comparable to Weber's case in either scope or magnitude.

247.   Defendant Leslie submitted the Leslie-DeMattia Memorandum knowingly, purposefully, and maliciously to mislead the Court in singling out Weber as the only Medicaid provider who has used the 99070 Code in this manner.

**The Franks Hearing**

248.    The Franks hearing in the Unlawful Criminal Prosecution commenced on October 8, 2003.

249.    Based on the testimony of Defendant McCormick at the Franks hearing, it was clear that there was no probable cause to prosecute Weber.  Nevertheless, Defendant Leslie was under explicit instructions from his supervisor Defendant Murray to maintain the Unlawful Criminal Prosecution of Weber and continue with the hearing.

250.    On October 9, 2003, Defendant McCormick testified that in light of his attorney-client relationship with the prosecutor, he knowingly withheld documents from Weber.

251.    Because probable cause never existed, on October 9, 2003, the second day of Defendant McCormick's testimony at the Franks hearing, and in light of testimony from Defendant McCormick that was untruthful and contradicting and disclosed that he purposefully withheld evidence from Weber, Defendant Leslie offered to *nolle prosequi* the case against Weber only if Weber would stipulate to the existence of probable cause, thereby insulating Defendant Leslie and the OCSA/MFCU from potential civil liability.

252.    Defendant Leslie testified in the Weber Claims Proceeding that his "ultimate goal" was to recoup the approximately $8,000 Weber had been paid by DSS for his use of the 99070 Code.

253.    As such, even after realizing that there was no probable cause to continue – or start – the Unlawful Criminal Prosecution, Defendant Leslie still attempted to extort the approximately $8,000 as part of settlement negotiations to terminate the Unlawful Criminal Prosecution.

47

254.    Moreover, Defendant Leslie would only agree to terminate the Criminal Prosecution if Weber waived his rights to pursue claims against the OCSA/MFCU and its employees for violations of Weber's constitutionally-protected rights.

255.    Weber rejected these extortive offers by Defendant Leslie.

256.    Because probable cause never existed, on October 20, 2003, the third day of Defendant McCormick's testimony at the <u>Frank's</u> hearing, Defendant Leslie offered to Weber an unconditional *nolle prosequi* of the case if Weber would withdraw his Motion to Dismiss and the Motions to Suppress.

257.    Approximately two hours later, Weber accepted this offer from Defendant Leslie only to be informed that Defendant Leslie's superiors, including Defendants Murray and DeMattia, had rescinded the offer and it was no longer available.

258.    In November 2003, Defendant Leslie requested to remove himself from the prosecution of Weber citing ethical and professional concerns to the Court (Keller, J.) he had about maintaining the criminal prosecution.

259.    Specifically, Defendant Leslie believed the OCSA/MFCU lacked probable cause to proceed against Weber.

260.    On December 22, 2006, the Unlawful Criminal Prosecution was dismissed with prejudice as against the OCSA/MFCU.  Present to orally move for dismissal on behalf of the OCSA/MFCU was Defendant Murray.

261.    Weber also requested, and was granted, an Order for the erasure of any and all criminal records and files pertaining to this case.

262.   The Unlawful Criminal Prosecution resulted in Weber being effectively forced to terminate his contractual relationship with Medicaid, which prevents Weber from being reimbursed by DSS for performing treatments or procedures on Medicaid patients.

263.   The Unlawful Criminal Prosecution also resulted in damage to Weber's reputation, loss of business, jeopardy to his hospital privileges and Medicare practice, and injury to the health and well-being of himself and his family.

264.   A memorandum subsequently written by Defendant Murray identifies Defendant McCormick's testimony in the prosecution of Weber as "problematic."

265.   Moreover, during the prosecution of Weber, Defendant Leslie advised Defendants DeMattia and Murray that he (Defendant Leslie) was afraid "we are all going to get sued."

266.   Defendant Leslie further advised Defendant Murray that he (Defendant Leslie) "believe[s] that DSS gave [Weber] permission to bill using 99070 for the cost of his laser facility."

## COUNT I– MALICIOUS PROSECUTION

267.   Weber incorporates all the factual allegations set forth in paragraphs 1-266 as though they were fully set forth herein.

268.    Defendants McCormick, Frank, Comerford, Wilson-Coker, Wietrak, Leslie, DeMattia, Murray, Salerno, DiNino, O'Brien, Maurer, Oborski, McDonnell, Mihalakos, Warren, and Qualidigm (collectively the "Malicious Prosecution Defendants") participated in the reckless and malicious investigation leading to, commencement and/or maintenance of the Unlawful Criminal Prosecution against Weber.

269.     The criminal proceeding against Weber was terminated in his favor.

270.     The Malicious Prosecution Defendants, individually and/or in concert with one another, acted without probable cause during the initiation, commencement, and/or maintenance of the Unlawful Criminal Prosecution.

271.     The Malicious Prosecution Defendants acted maliciously while investigating, commencing and or maintaining said action against Weber by intending to vex, annoy, and or injure him.

272.     The Malicious Prosecution Defendants acted maliciously and in retaliation against Weber for his lawful exercise of his First Amendment rights by investigating, commencing, initiating, and/or maintaining said action against Weber.

273.     As an actual, legal and proximate result of the foregoing, Weber suffered, among other things, damages, detention and imprisonment against his will, loss of earning capacity, damage to his reputation, and damage to his relationships with Medicaid and non-Medicaid patients, Stamford Hospital, Medicare and other heath insurance companies, and other professional referral sources, as well as other injury.

274.     The Malicious Prosecution Defendants' conduct was a violation of Weber's rights as secured by the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

275.     Each of the Malicious Prosecution Defendants is sued for malicious prosecution joint and severally and in both their individual and/or official capacities.


## COUNT II – ILLEGAL SEARCH AND SEIZURE

276.     Weber incorporates by reference the allegations of paragraphs 1 through 273 above, as though fully set forth herein.

277.    Defendants McCormick, Salerno, Leslie, DiNino, O'Brien, Maurer, Oborski, and Qualidigm (collectively the "Illegal Search and Seizure Defendants") caused and intended to have caused, an illegal search of Weber's Stamford office.

278.    Such search was conducted pursuant to a defective warrant, which the Illegal Search and Seizure Defendants, acting individually or in concert with one another, knew was issued without probable cause, in violation of Weber's rights as secured by the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

279.    As an actual, legal and proximate result of the foregoing, Weber suffered damages and injury.

280.    Each of the Illegal Search and Seizure Defendants is sued for illegal search and seizure joint and severally and in both their individual and/or official capacities.


COUNT III – FALSE ARREST

281.    Weber incorporates by reference the allegations of paragraphs 1 through 273 above, as though fully set forth herein.

282.    Defendants McCormick, Salerno, Leslie, DiNino, Oborski, McDonnell, Mihalakos, Warren, and Qualidigm (collectively the "False Arrest Defendants"), caused and intended to have caused, a false and unlawful restraint of Weber's physical liberty against his will.

283.    The False Arrest Defendants caused, and intended to have caused, an arrest warrant for the arrest of Weber that was invalid and without legal effect.

284.    The False Arrest Defendants, acting individually and/or in concert with one another, arrested Weber or caused Weber to be arrested without probable cause.

285.     Such wanton and reckless acts of the False Arrest Defendants were in violation of Weber's rights as secured by the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

286.     As an actual, legal and proximate result of the foregoing, Weber suffered damages and injury.

287.     Each of the False Arrest Defendants is sued for false arrest joint and severally and in both their individual and/or official capacities.


COUNT IV – VIOLATION OF DUE PROCESS

288.     Weber incorporates by reference the allegations of paragraphs 1 through 273 above, as though fully set forth herein.

289.     Defendants McCormick, Frank, Comerford, and Wietrak (collectively the "Due Process Defendants") caused and had intended to have caused Weber's referral for criminal investigation to occur in violation of Weber's rights of due process.

290.     The Due Process Defendants, acting individually and/or in concert with one another, knew or should have known that their conduct violated DSS procedures for the referral of Medicaid providers to the OCSA/MFCU for criminal investigation in violation of Weber's rights as secured by the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

291.     As an actual, legal and proximate result of the foregoing, Weber suffered damages and injury.

292.     Each of the Due Process Defendants is sued for violating Weber's due process rights joint and severally and in both their individual and/or official capacities.

## COUNT V – FIRST AMENDMENT RETALIATION

293.    Weber incorporates by reference the allegations of paragraphs 1 through 273 above, as though fully set forth herein.

294.    Defendants Wilson-Coker, McCormick, Frank, Wietrak, and Comerford (collectively the "First Amendment Retaliation Defendants"), acting individually and/or in concert with one another, engaged in reckless and wanton conduct designed to chill Weber's First Amendment rights as secured by the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

295.    Specifically, the First Amendment Retaliation Defendants took such illegal and unconstitutional action against Weber solely based on his decision to exercise his First Amendment rights to redress grievances with his state representative, a right protected by the First Amendment to the United States Constitution.

296.    As an actual, legal and proximate result of the foregoing, Weber suffered damages and injury.

297.    Each of the First Amendment Retaliation Defendants is sued for First Amendment retaliation joint and severally and in both their individual and/or official capacities.

## COUNT VI – RACKETEERING AND
## INFLUENCED CORRUPT ORGANIZATIONS

The RICO Enterprise

298.    Weber incorporates by reference the allegations of paragraphs 1 through 273 above, as though fully set forth herein.

299.    DSS, OCSA/MFCU and Qualidigm, acting together, is an enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, or the activities of which, affect interstate commerce.

300.    Defendants McCormick, Frank, Comerford, Wilson-Coker, Wietrak, Leslie, DeMattia, Murray, DiNino, Maurer, McDonnell, Warren and Qualidigm are associated with DSS and OCSA/MFCU for the common purpose of engaging in the pattern of racketeering activity described herein.

**Pattern of Racketeering Activity**

301.    Defendants McCormick, Frank, Comerford, Wilson-Coker, Wietrak, Leslie, DeMattia, Murray, DiNino, Maurer, McDonnell, Warren, DSS, OCSA/MFCU, and Qualidigm (the "RICO Defendants") had a common scheme or plan to prosecute Weber unlawfully and without probable cause in order to collect an unlawful debt from Weber in the form of fines and/or restitution as alleged in the Unlawful Criminal Prosecution and to chill Weber in exercising his First Amendment rights, and this scheme was attempted through a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(1) and (5).

302.    The RICO Defendants conducted and conspired to conduct the affairs of DSS, OCSA/MFCU and Qualidigm through a pattern of racketeering activity in violation of Sections 1962(c) and (d).

303.    Among others, the following acts engaged in by the RICO Defendants constitute racketeering activity as that terms is defined by 18 U.S.C. § 1961(1)(B):

(1)     Mail fraud pursuant to 18 U.S.C. § 1341 in that the Wilson-Coker Response, sent by Defendants McCormick, Wietrak, and Wilson-Coker through the mail, on February 21, 2001, was made with the intent to provide a fraudulent response to the Truglia Letter concerning Weber's complaints about DSS and

purposefully omitted material facts as part of a scheme by DSS and Defendants McCormick, Wietrak, and Wilson-Coker to fraudulently obtain Weber's property, including Weber's money due and owing from Medicaid for treatment provided to Medicaid recipients;

(2)     Mail fraud pursuant to 18 U.S.C. § 1341 for a letter sent by Qualidigm and Defendant McDonnell through the mail on August 28, 2002, made with the intent to fraudulently justify allegations of larceny against Weber and purposefully omitting material facts;

(3)     Wire fraud pursuant to 18 U.S.C. § 1343 for a telephone call transmitted by means of wire communication from Defendant DiNino to Defendant Frank on January 8, 2002, made with the intent to solicit and/or receive fraudulent allegations of larceny and purposefully omitting material facts

(4)     Wire fraud pursuant to 18 U.S.C. § 1343 for a telephone call transmitted by means of wire communication from Defendant DiNino to Rivera on February 25, 2002, made with the intent to notify Weber of the fraudulent scheme designed to deprive him of his property without due process;

(5)     Wire fraud pursuant to 18 U.S.C. § 1343 for a telephone call transmitted by means of wire communication from Defendant Frank to Defendant McDonnell and/or Qualidigm sometime before April 12, 2002, made with the intent to provide baseless allegations of fraud in support of the Arrest Warrant and purposefully omitting material facts;

(6)     Wire fraud pursuant to 18 U.S.C. § 1343 for a telephone calls transmitted by means of wire communication between Defendant DiNino and Defendant Warren on or about May 22, 2002, July 5, 2002, and September 23, 2002, made with the intent to provide baseless allegations of fraud in support of the Arrest Warrant and purposefully omitting material facts;

(7)     Wire fraud pursuant to 18 U.S.C. § 1343 for an electronic mail ("e-mail") transmitted by means of wire communication from Defendant Comerford to Defendant McCormick on December 12, 2002, made with the intent to provide fraudulent responses to questions concerning Weber's use of the 99070 Code;

(8)     Wire fraud pursuant to 18 U.S.C. § 1343 for a facsimile transmitted by means of wire communication from Defendant Frank to Defendant Leslie on December 12, 2002, made with the intent to provide fraudulent responses to questions concerning Weber's use of the 99070 Code and purposefully omitting material facts;

(9)     Wire fraud pursuant to 18 U.S.C. § 1343 for a facsimile transmitted by means of wire communication from Defendant McCormick to Defendant Leslie on

55

December 20, 2002, made with the intent to fraudulently reply to a FOIA claim by Weber;

(10)   Wire fraud pursuant to 18 U.S.C. § 1343 for an e-mail transmitted by means of wire communication from Defendant Frank to Defendant Leslie on May 2, 2003, made with the intent to provide fraudulent responses to questions relative to Weber's use of the 99070 Code and purposefully omitting material facts;

(11)   Wire fraud pursuant to 18 U.S.C. § 1343 for an e-mail transmitted by means of wire communication from Defendant Leslie to Defendant Maurer on May 7, 2003, made with the intent to defraud Weber concerning an existing plea agreement between Defendant Leslie and Weber;

(12)   Wire fraud pursuant to 18 U.S.C. § 1343 for an e-mail transmitted by means of wire communication from Defendant Leslie to Defendant Maurer on May 15, 2003, made with the intent to defraud Weber concerning an existing plea agreement between Defendant Leslie and Weber;

(13)   Wire fraud pursuant to 18 U.S.C. § 1343 for a telephone call transmitted by means of wire communication from Defendant McDonnell to Defendant Leslie on or about October 6, 2003, made with the intent to support fraudulent allegations in the Unlawful Criminal Proceeding and purposefully omit material facts;

(14)   Wire fraud pursuant to 18 U.S.C. § 1341 for a telephone call transmitted by means of wire communication from Defendant Leslie to Weber on October 20, 2003, made with the intent to defraud by rescinding a settlement offer made by Defendant Leslie two hours earlier in Hartford Superior Court;

(15)   Wire fraud pursuant to 18 U.S.C. § 1343 for a facsimile transmitted by means of wire communication sent by Defendant Murray to Defendant Leslie on December 4, 2003, made with intent to defraud by questioning the existence of probable cause in the Unlawful Criminal Proceeding;

(16)   Wire fraud pursuant to 18 U.S.C. § 1343 for a facsimile transmitted by means of wire communication sent by Defendant Leslie to Defendant Murray on December 12, 2003, made with intent to defraud by providing fraudulent information and purposefully omitting material facts concerning the lack of probable cause in the Unlawful Criminal Proceeding;

(17)   Extortion by Defendant Leslie offering to only terminate the Unlawful Criminal Prosecution in exchange for payment of monies to the State when Defendant Leslie knew that probable cause did not exist to maintain the Unlawful Criminal Prosecution; and

(18)   Extortion by Defendants Murray and DeMattia by directing Defendant Leslie to maintain the Unlawful Criminal Prosecution of Weber without probable cause to deprive Weber of his property without due process.

304.   Each of the foregoing predicate acts was conducted as part of a scheme by the RICO Defendants to fraudulently obtain Weber's property, including fines and restitution alleged as part of the Unlawful Criminal Prosecution, and to chill Weber for exercising his First Amendment rights.

305.   Weber relied on each foregoing instance of mail and wire fraud and the misrepresentation or material omissions contained therein as he was forced to defend himself through the duration of the Unlawful Criminal Proceeding.

306.   As a result of the RICO Defendants' violations of 18 U.S.C. § 1962, Weber has suffered damages and injury.

307.   Each of Defendants McCormick, Frank, Comerford, Wilson-Coker, Wietrak, Leslie, DeMattia, Murray, DiNino, Maurer, McDonnell, Warren, and Qualidigm are sued for RICO joint and severally and in both their individual and/or official capacities.


COUNT VII – NEGLIGENT SUPERVISION/§ 1983

308.   Weber incorporates all the factual allegations set forth in paragraphs 1-273 as though they were fully set forth herein.

309.   Immediately preceding and during the Unlawful Criminal Prosecution, the OCSA/MFCU was mired in internal strife and discontent.

310.   Both Defendants Leslie and DeMattia applied for the vacancy to replace Defendant Salerno, but, despite a limited amount of trial and Medicaid experience, Defendant DeMattia was selected by Defendant Morano as her successor on or about March 2003.

311.    After Defendant DeMattia's appointment, Defendant Leslie became a disgruntled employee, slamming doors, stomping up and down the hall, and not speaking to anyone in the OCSA/MFCU.

312.    In the Spring of 2003, a draft report critical of the OCSA/MFCU was filed with the United States Office of Inspector General ("OIG") of the Department of Health and Human Services, the federal agency charged with oversight and funding responsibilities of the MFCU.

313.    Defendants DeMattia and Murray concluded that Defendant Leslie filed the draft report with the OIG with disparaging and inaccurate information all of which Defendant Murray believed to be subversion of the MFCU by Defendant Leslie.

314.    The relationship between Defendant DeMattia, the Supervisory State's Attorney of the OCSA/MFCU, and Defendant Leslie continued to deteriorate during the Unlawful Criminal Prosecution, such that Defendant DeMattia no longer assigned any cases to Defendant Leslie.

315.    Defendants Morano, Murray, and DeMattia, all supervisors of Defendant Leslie, had specific knowledge of Defendant Leslie's discontent and the fact that Defendant Leslie needed to "create work" for himself in the OCSA/MFCU, yet wantonly and recklessly, or knowingly, allowed Leslie to wantonly and recklessly, or knowingly continue the Unlawful Criminal Prosecution.

316.    The OCSA/MFCU and Defendants Morano, Murray, and DeMattia had a duty to supervise Defendant Leslie.

317.    The OCSA/MFCU and Defendants Morano, Murray, and DeMattia knew, or should have known, that Defendant Leslie had a propensity to engage in tortious behavior.

318.    The OCSA/MFCU and Defendants Morano, Murray, and DeMattia failed, refused, or neglected to supervise, train, instruct, monitor, adequately screen, hire or otherwise direct Defendant Leslie regarding Weber in order to protect Weber from the negligent, reckless, intentional or tortious acts of Defendant Leslie.

319.    Moreover, Defendant Murray intentionally and blatantly disregarded the personal supervision procedures of the OCSA regarding Defendant Leslie.

320.    Weber suffered damages and injury as a result of the negligent conduct by OCSA/MFCU and Defendants Morano, Murray, and DeMattia, including violation of Weber's rights as secured by the United States Constitution and 42 U.S.C. § 1983.

321.    Defendants Morano, Murray, and DeMattia are sued for negligent supervision joint and severally and in both their individual and/or official capacities.

COUNT VIII – NEGLIGENT SUPERVISION/§ 1983

322.    Weber incorporates all the factual allegations set forth in paragraphs 1-273 as though they were fully set forth herein.

323.    The OCSA/MFCU and Defendants DeMattia and Skinner had a duty to supervise OCSA/MFCU employees and investigators, including Defendants DiNino, O'Brien, Oborski, and Maurer.

324.    The OCSA/MFCU and Defendants DeMattia and Skinner knew, or should have known, that Defendants DiNino, O'Brien, Oborski, and Maurer had a propensity to engage in tortious behavior.

325.    The OCSA/MFCU and Defendants DeMattia and Skinner failed, refused, or neglected to supervise, train, instruct, monitor, adequately screen, hire or otherwise direct

Defendants DiNino, O'Brien, Oborski, and Maurer regarding Weber in order to protect Weber from the negligent, reckless, intentional or tortious acts of Defendants DiNino, O'Brien, Oborski, and Maurer.

326.    Weber suffered damages and injury as a result of the negligent conduct by OCSA/MFCU and Defendants DeMattia and Skinner, including violation of Weber's rights as secured by the United States Constitution and 42 U.S.C. § 1983.

327.    Defendants DeMattia and Skinner are sued for negligent supervision joint and severally and in both their individual and/or official capacities.


<u>COUNT IX – NEGLIGENT SUPERVISION/§ 1983</u>

328.    Weber incorporates all the factual allegations set forth in paragraphs 1-273 as though they were fully set forth herein.

329.    DSS and Defendant Wilson-Coker had a duty to supervise DSS employees, including Defendants McCormick, Frank, Comerford, and Wietrak.

330.    DSS and Defendant Wilson-Coker knew, or should have known, that Defendants McCormick, Frank, Comerford, and Wietrak had a propensity to engage in tortious behavior.

331.    DSS and Defendant Wilson-Coker failed, refused, or neglected to supervise, train, instruct, monitor, adequately screen, hire or otherwise direct Defendants McCormick, Frank, Comerford, and Wietrak regarding Weber in order to protect Weber from the negligent, reckless, intentional or tortious acts of Defendants McCormick, Frank, Comerford, and Wietrak.

60

332.    Weber suffered damages and injury as a result of the negligent conduct by DSS and Defendant Wilson-Coker, including violation of Weber's rights as secured by the United States Constitution and 42 U.S.C. § 1983.

333.    Defendant Wilson-Coker is sued for negligent supervision in her individual and/or official capacities.

## COUNT X – NEGLIGENT SUPERVISION/§ 1983

334.    Weber incorporates all the factual allegations set forth in paragraphs 1-273 as though they were fully set forth herein.

335.    Qualidigm and Defendant Warren had a duty to supervise its employees, including Defendants McDonnell and Mihalakos.

336.    Qualidigm and its employees are the agents of DSS and the OCSA.

337.    Qualidigm and Defendant Warren knew, or should have known, that Defendants McDonnell and Mihalakos had a propensity to engage in tortious behavior.

338.    Qualidigm and Defendant Warren failed, refused, or neglected to supervise, train, instruct, monitor, adequately screen, hire or otherwise direct Defendants McDonnell and Mihalakos regarding Weber in order to protect Weber from the negligent, reckless, intentional or tortious acts of Defendants McDonnell and Mihalakos.

339.    Weber suffered damages and injury as a result of the negligent conduct by Qualidigm and Defendant Warren, including violation of Weber's rights as secured by the United States Constitution and 42 U.S.C. § 1983.

340.    Qualidigm and Defendant Warren are sued for negligent supervision joint and severally and in both their individual and/or official capacities.

## COUNT XI – NEGLIGENT SUPERVISION

341.    Weber incorporates all the factual allegations set forth in paragraphs 1-273 as though they were fully set forth herein.

342.    Qualidigm and Defendant Warren had a duty to supervise its employees, including Defendants McDonnell and Mihalakos.

343.    Qualidigm and its employees are not state actors.

344.    Qualidigm and Defendant Warren acted with malice and knew, or should have known, that Defendants McDonnell and Mihalakos had a propensity to engage in tortious behavior.

345.    Qualidigm and Defendant Warren failed, refused, or neglected to supervise, train, instruct, monitor, adequately screen, hire or otherwise direct Defendants McDonnell and Mihalakos regarding Weber in order to protect Weber from the negligent, reckless, intentional or tortious acts of Defendants McDonnell and Mihalakos.

346.    Weber suffered damages and injury as a result of the negligent conduct by Qualidigm and Defendant Warren.

347.    Qualidigm and Defendant Warren are sued for negligent supervision joint and severally and in both their individual and/or official capacities.

## COUNT XII – BREACH OF CONTRACT

348.    Weber incorporates all the factual allegations set forth in paragraphs 1-273 as though they were fully set forth herein.

349.     Weber had a contract with DSS, the Provider Agreement, to be reimbursed for providing Medicaid services.

350.     The Final Audit Report resulted in Weber not being paid for services rendered to Medicaid recipients pursuant to the terms of the Provider Agreement.

351.     Weber has suffered financial damages as a result of DSS's breach of the Provider Agreement.


COUNT XIII – NEGLIGENT HIRING

352.     Weber incorporates all the factual allegations set forth in paragraphs 1-273 as though they were fully set forth herein.

353.     DSS, as the agency responsible for administrating the federal-state Medicaid program, has a duty to administer said program consistent with a standard of care.

354.     OCSA/MFCU has a duty to investigate allegations of criminal conduct concerning participants in the State of Connecticut's federal-state Medicaid program consistent with a standard of care.

355.     DSS and Defendant McCormick recommended that OCSA/MFCU and Defendant DiNino contract with Qualidigm to review Weber's Medicaid billing records in order to determine the existence of fraud.

356.     DSS, Defendant McCormick, OCSA/MFCU, and Defendants DiNino, Maurer, and Salerno acted with malice and knew, or should have known, that Qualidigm was inexperienced and without qualifications, education, or training to perform the work required by the OCSA/MFCU to review Weber's Medicaid billing records, to understand the systemic

billing problems with DSS Medicaid reimbursements, and to understand the use of the 99070 Code.

357.    DSS, Defendant McCormick, OCSA/MFCU, and Defendants DiNino, Maurer, and Salerno breached their duty to Weber as a Medicaid provider by failing to exercise the appropriate standard of care when hiring Qualidigm to review Weber's Medicaid billing records in order to determine the existence of fraud.

358.    Weber has suffered damages and injury as a result of the negligent hiring of Qualidigm.

359.    Defendants McCormick, DiNino, Maurer, and Salerno are sued for negligent hiring joint and severally in both their individual and/or official capacities.


<u>COUNT XIV – NEGLIGENCE</u>

360.    Weber incorporates all the factual allegations set forth in paragraphs 1-273 as though they were fully set forth herein.

361.    Qualidigm is the entity responsible for reviewing Medicaid billing records at the direction DSS and OCSA/MFCU for purposes of assisting in criminal investigations of Medicaid providers.

362.    As such, Qualidigm has a duty to ensure that its employees are properly qualified, educated, and trained to perform such work at the direction of DSS and OCSA/MFCU consistent with a standard of care.

363.    Qualidigm and Defendants Warren and Mihalakos acted with malice and knew, or should have known, that its employees were inexperienced and without qualifications, education, or training to perform the work required by DSS and the

OCSA/MFCU to review Weber's Medicaid billing records, to understand the systemic billing problems with DSS Medicaid reimbursements, and to understand the use of the 99070 Code.

364.    Qualidigm and Defendants Warren and Mihalakos breached its duty to Weber as a Medicaid provider by not exercising the appropriate standard of care by employing qualified personnel, or by not adequately training or educating existing personnel, to review Weber's Medicaid billing records in order to determine the existence of fraud.

365.    Weber has suffered damages and injury as a result of negligence by Qualidigm and Defendant's Warren and Mihalakos.

366.    Qualidigm and Defendants Warren and Mihalakos are sued for negligence joint and severally in both their individual and/or official capacities.

### COUNT XV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

367.    Weber incorporates all the factual allegations set forth in paragraphs 1-273 as though they were fully set forth herein.

368.    Defendants McCormick, Frank, Leslie, Murray, and DeMattia (the "IIED Defendants"), acting alone or in concert with one another acted with malice and knew or should have known that their conduct would cause Weber to have emotional distress.

369.    The conduct of the IIED Defendants to initiate, commence, and maintain the Unlawful Criminal Prosecution of Weber was extreme and outrageous.

370.    As a result, Weber has suffered severe emotional distress.

371.    Defendants McCormick, Frank, Leslie, Murray, and DeMattia are sued for intentional infliction of emotion distress joint and severally in both their individual and/or official capacities.

## COUNT XVI – NEGLIGENT INFLICATION OF EMOTIONAL DISTRESS

372.    Weber incorporates all the factual allegations set forth in paragraphs 1-273 as though they were fully set forth herein.

373.    The Individual Defendants and Qualidigm (the "NIED Defendants"), acting individually and/or in concert with one another acted with malice and engaged in conduct towards Weber that created an unreasonable risk of causing emotional distress.

374.    Weber has suffered severe emotional distress as a result of the NIED Defendant's conduct, including illness or bodily harm.

375.    Weber's emotional distress from conduct by the NIED Defendants conduct was foreseeable.

376.    The NIED Defendants conduct was the cause of Weber's severe emotional distress, including illness or bodily harm.

377.    Each of the Individual Defendants is sued for negligent infliction of emotional distress joint and severally in both their individual and/or official capacities.

## COUNT XVII – INTERFERENCE WITH BUSINESS RELATIONS

378.    Weber incorporates all the factual allegations set forth in paragraphs 1-273 as though they were fully set forth herein.

379.    Prior to the Unlawful Criminal Prosecution, Weber had a successful business relationship with various Medicaid patients, non-Medicaid patients, Stamford Hospital, Medicare and other insurance companies, and other professional referral sources ("Business Relations").

380.    DSS and Defendants McCormick, Frank, Comerford, Wietrak, and Wilson-Coker acted with malice and knew, or should have known, of Weber's Business Relations.

381.    DSS and Defendants McCormick, Frank, Comerford, Wietrak, and Wilson-Coker, acting independently and/or in concert with one another, intentionally interfered with Weber's Business Relations.

382.    As a direct result of DSS and Defendants McCormick, Frank, Comerford, Wietrak, and Wilson-Coker interfering with Weber's Business Relations, Weber has suffered actual pecuniary loss.

383.    Defendants McCormick, Frank, Comerford, Wietrak, and Wilson-Coker are sued for intentional interference with Weber's Business Relations joint and severally in both their individual and/or official capacities.

<u>COUNT XVIII – INTERFERENCE WITH CONTRACT RELATIONS</u>

384.    Weber incorporates all the factual allegations set forth in paragraphs 1-273 as though they were fully set forth herein.

385.    Prior to the Unlawful Criminal Prosecution, Weber had a contractual relationship with Medicaid, Medicare, and other insurance companies.

386.    DSS and Defendants McCormick, Frank, Comerford, Wietrak, and Wilson-Coker acted with malice and knew or should have known of Weber's contractual relationship with Medicaid, Medicare, and other insurance companies.

387.    DSS and Defendants McCormick, Frank, Comerford, Wietrak, and Wilson-Coker, acting individually and/or in concert with one another, intentionally interfered with

67

Weber's contractual relationships with Medicaid, Medicare, and other insurance companies, and such interference was tortious.

388.    As a result of DSS and Defendants McCormick, Frank, Comerford, Wietrak, and Wilson-Coker tortious interference with Weber's contractual relationship with Medicaid, Medicare and other insurance companies, Weber has suffered actual pecuniary loss.

389.    Defendants McCormick, Frank, Comerford, Wietrak, and Wilson-Coker are sued for intentional interference with Weber's contractual relations joint and severally in both their individual and/or official capacities.


**JURY DEMAND**

390.    Weber hereby demands a jury trial in this matter.

WHEREFORE, Plaintiff respectfully demands judgment in his favor as follows:

(a)     An order that the Entity Defendants and the Official Defendants be permanently enjoined from taking action to recoup reimbursements paid to Weber for use of the 99070 Code and directed to refund all such recoupments to Weber;

(b)     An award of damages against each of the Individual Defendants, in their individual or personal capacities, for compensatory damages in an amount to be determined at trial;

(c)     An award of treble damages pursuant to 18 U.S.C. § 1964, in addition to attorneys' fees and costs;

(d)     Punitive damages;

(e)     Attorneys' fees and costs for the maintenance of this suit pursuant to 42 U.S.C. § 1988;

(f)     Attorneys' fees and costs for the maintenance of this suit;

(g)     Attorneys' fees and costs for the associated with the Unlawful Criminal Prosecution; and

(h)     Other relief deemed appropriate by the Court.

Respectfully submitted,

RICHARD B. WEBER, M.D.

By /s/ Michael C. Harrington
    Michael C. Harrington – ct17140
    Ryan M. Mihalic – ct24454

Murtha Cullina LLP
CityPlace I - 185 Asylum Street
Hartford, Connecticut 06103-3469
Telephone:  (860) 240-6000
Facsimile:  (860) 240-6150
His Attorneys